# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In Re: Pizzeria Management III LLC, | Case No. 25-11334-jps |
| Debtor in Possession. | Chapter 11 Subchapter V |
| | Judge Jessica E. Price Smith |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF FINAL ORDER PERMITTING USE OF CASH COLLATERAL

Debtor Pizzeria Management III LLC ("Pizzeria") respectfully moves this Court for the entry of a Final Order permitting the use of cash collateral on a limited basis in accordance with the attached cash-basis budget. In support of its Motion, the Debtor respectfully sets forth the following:

**Jurisdiction, Venue, and Procedural Posture**

1. This case was commenced on March 31, 2025, when the Debtor filed a Voluntary Petition for Relief under Chapter 11 of the U.S. Bankruptcy Code.

2. This Court has jurisdiction over this matter under and pursuant to 28 U.S.C.§§ 157 and 1334.

3. Venue is proper in this Court under 28 U.S.C. §§1408 and 1409. This is a core proceeding under 28 U.S.C.§157(b)(2)(M).

4. The Debtor remains in possession of its property and in control of its assets pursuant to 11 U.S.C.§§1107 and 1108.

## Background

5. The Debtor is engaged in the business of operating a restaurant specializing in Pizza and related casual dining style food and beverages.

6. The Debtor presently operates as "Zeppe's Tavern" under a franchise agreement between Jason Dicks, the sole member of the Debtor, and Zeppe's Tavern Franchise LLC.

7. Concurrently with the filing of this case, Jason Dicks has filed his own reorganization case in this Court under Chapter 11 subchapter V.

## The Need to Use Cash to Operate Until the Proposed Auction Sale

8. The Debtor operates a single, very busy restaurant location. The Debtor has a continuous need to replenish its supplies of food and beverages, including, without limitation, alcoholic beverages.

9. The Debtor employs a large staff of cooks, servers, dishwashers, and managers. The Debtor's schedule E/F includes 36 employees, and the Debtor filed an emergency motion to approve payment of pre-petition wages in the aggregate amount of $26,983 for the period between March 11 and March 31. That Motion [Docket No. 7] was granted by Order of this Court [Docket No. 19] entered on April 3, 2025.

10. In addition, the Debtor has an urgent need to ensure that employees continue to be paid on time in the post-petition period, and that usual and customary operating expenses such as utilities, repairs, franchise fees and other routine expenses are paid in a timely fashion.

11. The Debtor will also need access to cash collateral during this case to pay administrative expenses, including among other things, such professional fees as may be approved by this court on a periodic basis.

12. Attached as Exhibit A is a 120-day operating budget prepared by the Debtor in support of this Motion.

## Secured Creditors Who Have or May Have, or May Claim to Have an Interest in Cash Collateral

13. There are five creditors who have, or may have, or may claim to have, an interest in the Debtor's cash collateral. The Debtor owed, as of the Petition Date, $36,070 to WebBank, an organization that provides point of sale processing for credit cards, and has loaned money to the Debtor under the terms of an agreement which permits WebBank to deduct small amounts of repayments as it processes credit card charges. WebBank filed a UCC-1 financing statement with the Ohio Secretary of State on September 13, 2023.

14. The Debtor owed, as of the Petition Date, $108,275 to Rewards Network, an on-line advertiser and lender which has loaned money to the Debtor under the terms of an agreement which permits Rewards Network to deduct repayments from credit card charges made by the Debtor's customers who are consumer members of its network. Rewards Network, through its agent Corporation Service Company, filed a UCC-1 financing statement with the Ohio Secretary of State on March 26, 2025.

15. The Debtor owed, as of the Petition Date, $117,000 to iPlanGroup, Agent for Christian Carson, based on a loan that Mr. Carson, through his self-directed IRA, made to the Debtor, Mr. Dicks, and an affiliate. iPlanGroup filed a UCC-1 financing statement with the Ohio Secretary of State on March 14, 2025.

16. The Debtor believes that Joseph and Cassie Ciresi, officers of Zeppe's Tavern Franchise LLC, may claim to have an interest in the Debtor's cash collateral based on a Security Agreement dated February 23, 2023, and has accordingly scheduled that claim as a contingent, unliquidated and disputed secured claim on Schedule D. No UCC-1 financing statement for the claim appears in the records of the Ohio Secretary of State.

17. The Debtor purchases substantially all of its food inventory from RDP Food Service. Although RDP's claim is scheduled as unsecured, a substantial portion of it is subject to the PACA (Perishable Agricultural Commodities Act) Trust, which is a floating trust imposed by a depression-era federal statute protecting producers and sellers of certain fresh and or frozen food commodities. Because the amounts involved are relatively small and are not subject, on a practical basis, to segregation between items which are and are not covered by the trust, the Debtor proposes to treat all of the proceeds of food inventory as subject to the Trust, and to continue to do business with RDP on a revolving credit basis in the ordinary course of business.

### Adequate Protection and Authority to Use Cash Collateral

18. Bankruptcy Code Section 363(c)(2) conditions use of cash collateral on the consent of each entity holding an interest in cash collateral or court authorization of the use of cash collateral after notice and a hearing. The Debtor's emergency motion to use cash collateral on interim basis [Docket No. 9] was granted by this Court by Order entered on April 2, 2025 [Docket No. 18], and the Debtor now requests continuing authorization to use cash collateral on a final basis in accordance with the 120-day budget attached hereto.

19. The Debtor needs to use cash collateral to fund its operations during this case. Without the ability to use its cash collateral, the Debtor would not be able to maintain its restaurant operations, and its going-concern value would decline precipitously, to the detriment of the Debtor and all parties in interest.

20. As the 120-day budget attached hereto demonstrates, the proposed use of cash collateral is expected to generate approximately $771,031.13, while using approximately $758,536.47. If those projections are accurate, there will be no decrease in estate value attributable to the use of cash collateral, which includes repayment to WebBank and Rewards

Network through credit card processing as described above in the aggregate amount of $73,765.43. Under these circumstances, no adequate protection would be required.

21. Two cases illustrate the reasons that adequate protection is not required where there is no decrease in asset value. *In re Mullen*, 172 B.R. 473 (Bankr. D. Mass. 1994), held that:

> A receivable or inventory lender does not lack adequate protection, even if it is undersecured, so long as the value of the stream of future accounts or inventory and their proceeds is not declining. As a result, orders routinely issue authorizing a debtor to use a lender's cash collateral consisting of the proceeds of receivables or inventory. The lender cannot complain about the debtor's consumption of any particular proceeds. Those proceeds are used to generate new collateral and new proceeds. Assuming the debtor is operating at no less than a break even, the new collateral and proceeds will be of at least equivalent value to any of those they replace. *Id. at* 477-78

22. Similarly, the case of *In re Smithfield Estates, Inc.,* 48 B.R. 910 (Bankr.D.R.I 1985) held that:

> an (under) secured creditor's position is no worse immediately after the filing than it was just prior thereto, and the provision for adequate protection may only protect the secured creditor from any impairment in the value of its interest that is attributable to the stay…The concept of adequate protection was not designed or intended to place an undersecured or minimally creditor in a better post-filing position than it was in before the stay.

23. Even if adequate protection is not required in this instance, however, the Debtor proposes to preserve the status quo in the case by providing all secured creditors or creditors who claim to be secured with replacement liens as described below during the interim cash collateral period. Specifically, the Debtor requests that the interim order provide creditors with replacement liens with the same validity and priority as their asserted pre-petition liens, to the extent, only, of any diminution of the value of each creditor's interest in the Debtor's cash collateral during the interim period. The Debtor believes that this will minimize procedure, expense, and controversy, and is fair to creditors.

24. As the budget demonstrates, the Debtor also proposes, during the 120-day budget period, to continue to purchase food in the ordinary course from RDP Food Service, with such purchases subject to the PACA Trust in the ordinary course of business.

25. **WHEREFORE**, the Debtor respectfully requests that this Court enter an Order permitting the Debtor to use cash collateral in accordance with its 120-day budget attached hereto, and providing creditors with replacement liens of equal priority and validity to the liens they held prior to the commencement of this case, to the extent of any diminution of the value of the creditors' interest in the Debtor's cash collateral during the interim period.

## Notice

The Debtor intends to provide notice of this motion and of the time and place of any hearing scheduled to address this motion to each of the five creditors identified herein, via email, fax, or telephone, as well as by U.S. mail.

Respectfully submitted,

/s/ Thomas W. Coffey (0046877)
Coffey Law LLC
2430 Tremont Avenue
Cleveland, OH 44113
(216) 870-8866
tcoffey@tcoffeylaw.com

*Proposed Counsel for the Debtor*

# EXHIBIT A

| | |
|---|---:|
| **Pizzeria Management III LLC** | |
| **120 Day Budget** | |
| **April 16 - August 14, 2025** | |
| | |
| | |
| Sales Income | $765,335.75 |
| Net Other Income (KENO and JukeBox) | $5,695.38 |
| **GROSS INCOME** | **$771,031.13** |
| | |
| **EXPENSES** | |
| State Sales Tax | $39,768.35 |
| POS equipment fees | $2,567.44 |
| Toast Credit Card Processing | $13,327.99 |
| | |
| Total for Advertising & marketing | $11,516.68 |
| Building Rent | $23,000.00 |
| Total for Repairs & maintenance | $8,315.97 |
| | |
| DCI payroll processing | $707.08 |
| Total Employee Payroll including Taxes | $229,041.90 |
| | |
| BMI music license | $311.40 |
| QuickBooks book keeping app | $128.12 |
| Insurance | $4,208.58 |
| Live Music- Bands | $33,398.00 |
| Meals | $925.54 |
| Office supplies | $189.26 |
| | |
| Bar Cost of Goods Sold | $85,264.82 |
| Food Cost of Goods Sold | $167,503.23 |
| Coca-Cola | $7,018.45 |
| | |
| NuCO2 Service | $1,008.86 |
| RTI Fryer Oil | $2,752.16 |

| | |
|---|---:|
| Towels and Mat Service | $3,317.07 |
| | |
| Franchise Fees (April 1-15) | $3,744.25 |
| | |
| Utilities (Electric/Gas/Sewer) | $18,719.55 |
| Ring Central Phone Service | $584.50 |
| Security System | $128.12 |
| Internet & TV services | $2,903.72 |
| Trash and Recycling Removal | $1,644.00 |
| Alco Dishwasher Rental | $276.00 |
| | |
| Toast/Web Bank | $27,471.49 |
| Rewards Network | $46,293.94 |
| | |
| Trustee retainer | $7,500.00 |
| Lawyer fees | $15,000.00 |
| | |
| **TOTAL EXPENSES** | **$758,536.47** |